UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | | |
|---|---|---|
| GINA VIBBERT, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 3:10-cv-00183-RLY-TAB |
| | ) | |
| INDIANA BELL TELEPHONE | ) | |
| COMPANY, INC., | ) | |
| Defendant. | ) | |

**ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Gina Vibbert ("Vibbert"), filed an Amended Complaint ("Complaint")

against Defendant, Indiana Bell Telephone Company, Inc. ("Indiana Bell"), alleging gender

discrimination (Count I), sexual harassment/hostile work environment (Count II), and retaliation

(Count III), all in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 *et. seq.*

Indiana Bell moves for summary judgment on all counts.  For the reasons set forth below, the

court **GRANTS** Indiana Bell's Motion for Summary Judgment on all Counts.

**I.      Facts**

Vibbert began her employment with Indiana Bell in 1987 or 1988 as an operator.

(Deposition of Gina Vibbert ("Vibbert Dep.") 13).  When the operator facility closed in 1990,

Vibbert lost her job at Indiana Bell; however, she returned in 1994 as a customer advocate.  (*Id.*

at 13-14; 32-33).  In April 2007, Vibbert moved into the position of customer service specialist,

also known as an installation and maintenance technician, due to rumors that her department was

closing and she could be surplused.  (*Id.* at 32-34).

1

## A.    Technician Training

Vibbert underwent six weeks of training after she became a technician.  (*Id.* at 35).  According to Vibbert, her training consisted of watching some videos in the garage, hands-on work with splicing materials, and a repair class out of town.  (*Id.*).  Another technician who worked with Vibbert, Jody Puro-Bennett ("Puro-Bennett"), described using a plywood backboard for training at the garage and complained of a lack of real world experience, compared to other technicians who received installation training using actual buildings.  (Deposition of Jody Puro-Bennett ("Puro-Bennett Dep.") 66-67).

Indiana Bell required technicians, including Vibbert, to comply with its Code of Business Conduct (the "Code") and Equal Employment Opportunity ("EEO") and Sexual Harassment Policies (collectively, the "Policies").  (Vibbert Dep. at 75-76).  Technicians were given an allotted amount of time to read the Policies and were required to sign a form acknowledging they had received the Code and Policies and would comply with them.  (*Id.* at 76-77).  Additionally, employees review the Code and Policies on an annual basis.  (*Id.* at 75-77).  Vibbert understood that engaging in fraudulent conduct such as misrepresenting herself as another employee violated the Code and that a violation of the Code could result in termination of her employment.  (*Id.* at 79, 81).  She also acknowledges that she knew she had an obligation to report conduct in violation of the Policies via supervisors, human resources, and an ethics hotline.  (*Id.* at 81).  Although Puro-Bennett also complained about what she felt was inadequate training regarding Indiana Bell's EEO and Sexual Harassment Policies, she acknowledges that she understood that the Policies required employees to report violations.  (*Id.* at 56).

2

**B.      Vibbert's Duties and Performance**

Network Service Managers supervise installation and maintenance technicians.

(Declaration of Amanda Lankford ("Lankford Decl.") ¶ 3).   Amanda Lankford ("Lankford")

supervised Vibbert in this capacity for most of Vibbert's time employed as a technician,

including at the time of her termination.  (Vibbert Dep. at 39-40).  Vibbert also at times took

direction from Tammy Ewers ("Ewers"), a Network Services Manager at the Boonville Garage.

(Vibbert Dep. at 40; Lankford Decl. ¶ 7).   Lankford and Ewers reported directly to Gene

Babinec ("Babinec"), a Network Area Manager, located in Columbus, Indiana.  (Declaration of

Gene Babinec ("Babinec Decl.") ¶ 2).   Babinec's responsibilities included overseeing the

Installation and Maintenance operation in Evansville, Indiana, including the Boonville Garage.

(*Id.* ¶ 2).

Technicians' jobs are assigned by a dispatch center based on their training and skills,

location, and availability.  (Lankford Decl. ¶ 5).  Installation jobs are generally one-person jobs.

(Vibbert Dep. at 44-45).  Most of Vibbert's work consisted of telephone and internet service

installation at customer residences and businesses; however, her training focused mainly on

repair work, which was considered more difficult than installations.  (*Id.* at 37-38).  Typically,

technicians like Vibbert report to their assigned garage in the morning, attend a team meeting,

and receive their job assignments for the day.  (*Id.* at 41-42).  Vibbert spent most of her day

working at various customer locations with no supervision.  (*Id.* at 42-43).

During her first year as a technician, there were occasions in which Vibbert had difficulty

completing her assignments and had to call fellow technicians for assistance.  (*Id.* at 48-50).

Vibbert primarily called Shawn Breen ("Breen"), then Vice President of Vibbert's union and

3

with whom she had a consensual sexual relationship, for help during that time. (*Id.* at 53, 61, 68; Vibbert Dep. Ex. 2). On November 1, 2007, Lankford counseled Vibbert to keep her cell phone conversations to a minimum when calling for help after she exceeded her allotted cell phone minutes by 1500 due in part to lengthy conversations with Breen. (*Id.* at 60-61; Vibbert Dep. Ex. 2). Vibbert agreed but insists that the lengthy conversations occurred when technicians were too busy to help in person and instead assisted her over the phone. (Vibbert Dep. at 61, Ex. 2).

Later in November 2007, Lankford met with Vibbert again regarding Vibbert's calls to other technicians for assistance. (Vibbert Dep. at 69, Ex. 3). Lankford instructed Vibbert to contact a manager if she needed help with an order. (*Id.*). Vibbert agreed but requested that Lankford and other managers watch who they send, because "some technicians aren't very helpful and tend to be negative about her need for assistance." (Vibbert Dep. Ex. 3). After her first year, technicians were instructed to contact their manager if they needed help. (*Id.* at 50).

### C. Alleged Harassment/ Notice

Vibbert alleged several forms of harassment during her time working as a technician, including being subject to name-calling, exposed to derogatory remarks on cross boxes, and sexually assaulted. (*Id.* at 149-50; 190-91). But the timing of notice given to Indiana Bell by Vibbert varied depending on the alleged incident.

### 1. Verbal Assaults

Vibbert alleges verbal harassment by her fellow employees. (*Id*. at 143-44). First, when Vibbert began working in the garage, Brian Titzer ("Titzer") referred to her and other employees who completed order jobs as "order bitches." (*Id*. at 164-65). Vibbert told Titzer that she did not want to hear that term used to describe her. (*Id*. at 166). In addition, Doug Boylls

4

("Boylls"), a co-worker, called Vibbert "dumb-dumb" multiple times because he had to fix her

prior work.  (*Id.* at 144-45).  And multiple employees, including technician Bob Ludwig

("Ludwig"), pronounced Vibbert's first name as "Jina" instead of "Gina," similar to the

pronunciation of the word "vagina."  (Vibbert Dep. at 146; Affidavit of Gina Vibbert ("Vibbert

Aff.") ¶ 1).

     In November 2007, Vibbert alerted Lankford of Boylls referring to her as a "dumb-

dumb" and Ludwig's mispronunciation of her name; however, she did not report the "order

bitches" comments at that time.  (Vibbert Dep. at 149-150).  The "order bitches" comment was

first reported to Indiana Bell in April 2009 to Senior EEO Consultant, Marybeth Dunne

("Dunne"), who was conducting an internal and external investigation into Vibbert's harassment

claims.  (Declaration of Marybeth Dunne ("Dunne Decl.") ¶ 8).

## 2. Written Insults

     In addition to verbal insults, the terminals for wires, called cross boxes, included

derogatory comments and pictures, such as "women need to be in the kitchen, not at work" and

other kinds of "women sayings."  (Vibbert Dep. at 150).  These comments were eventually

sprayed and covered up after about a year after they first started appearing in August 2007.  (*Id.*

at 150).  Vibbert first reported these comments to Lankford in the November 2007 meeting.  (*Id.*

at 149).

## 3. Todd Williams

     Vibbert also alleged several incidents of harassment involving co-worker Todd Williams

("Williams").  First, in the summer of 2008, Williams arrived at Vibbert's work site because he

had been assigned to help her; however, he told her he did not want to help but instead came for

a "blowjob."  (*Id*. at 188).  Vibbert denied these advances, and Williams helped her finish the next job.  (*Id*. at 189).

Then, in August 2008, while on a job site, Williams took Vibbert into a room, turned her around, and began masturbating.  (*Id*. at 189-90).  He then told Vibbert, "Don't you ever say a word."  (*Id*. at 190).  During a subsequent work outing, Vibbert stated that Williams had assisted her and after the job was complete told her, "You owe me."  (*Id*. at 191).  He then proceeded to force her head down to his penis to perform oral sex and said, "Don't you fucking tell anyone." (*Id*. at 191-92).  Vibbert alleged that there were approximately ten more incidents in which she was forced to give Williams oral sex.  (*Id*. at 190-91).[1]

On or about July or August 2008, Vibbert notified union representative Breen about Williams making the "blowjob" comment.  (*Id*. at 134-35).  Breen told Vibbert that he reported the information to union president, David Wilson, and Network Services Manager, Tammy Ewers.  (*Id*.)  But Vibbert did not report to Indiana Bell any of Williams' alleged physical harassment until her May 5, 2009 EEOC Charge letter, approximately nine months after the initial physical altercation in August 2008.  (*Id*. at 134-135; 190-91; s*ee also* Dunne Decl. ¶¶ 9-10).

---

[1]The court notes a discrepency in when these alleged sexual assaults concluded.  Vibbert testified that the harassment "continued on from that original time all the way through, I would say, approximately, January of '09 . . . [.]" (Vibbert Dep. at 190-91).  By contrast, Indiana Bell's internal investigation conducted by Dunne found that Vibbert alleged this behavior "continued through the end of [Vibbert's] employment" and, in particular, "up until a week before her March 12, 2009 suspension."  (Dunne Decl. ¶ 12; Ex. 5, p. 5).  Nonetheless, the date the alleged sexual misconduct stopped does not have any bearing on the merits of this motion as Indiana Bell did not have notice of such events until after Vibbert had been terminated.

### D. Fraudulent Calls

Starting in approximately August 2008, Vibbert began calling the Network Dispatch Center ("NDC") and represented herself as a manager to change her own work assignments, change the work assignments for other technicians, and request the location of co-workers Breen and Wendy Thompson ("Thompson").  (*Id*. at 99-102).  Vibbert made such calls to the NDC approximately 20 to 30 times during a six-month period even though she knew it was wrong to do so and never asked a manager for permission.  (*Id*. at 100-101).

Indiana Bell first learned of Vibbert's fraudulent conduct in February 2009.  (Babinec Dec. ¶ 4).  On February 26, 2009, Jason Neeley ("Neeley"), a duty manager who reported to Babinec, received a call from the NDC seeking clarification on two phone calls from an Indianapolis manager who asked for load changes in Evansville, which is about 180 miles from Indianapolis.  (*Id*. ¶ 4).  Neeley then contacted Ewers, who then contacted Babinec regarding the calls.  (*Id*.).  Babinec contacted the NDC and asked for recordings of the calls.  (*Id*.).  Ewers, Lankford and Bill Arvin – collectively, the Boonville Garage Managers – listened to the recordings and told Babinec they were confident that the voice of the "Indianapolis manager" was actually Vibbert's voice.  (*Id*. ¶ 5).  On February 27, 2009, Babinec reported the conduct to the Indiana Bell's Asset Protection Department, which investigates violations of the Code, for further investigation.  (*Id*. ¶ 6).  Babinec then suspended Vibbert pending further investigation because Babinec believed that Vibbert had committed fraud in violation of the Code by impersonating a manager.  (*Id*.).  Babinec also received additional recordings from the NDC which included other instances where Vibbert misrepresented herself as a manager in order to change jobs, return jobs, and request the location of Breen and Thompson.  (*Id*. ¶ 7).

7

**E. Investigation of Fraudulent Activity**

An investigation by Indiana Bell discovered that Vibbert had called the NDC, posing as a

manager and requesting changes, on February 14, 17, 23, 24, and 26.  (Lankford Decl. ¶ 9).  In

particular, the investigation revealed the following: (1) on February 14, 2009, Vibbert identified

herself as a Network Services Manager in Vincennes, Indiana, and asked that a work assignment

from her workload be removed and requested the location of Breen; (2) on February 17, 2009,

Vibbert represented herself as a Network Services Manager in Indianapolis and requested an

order be removed from her workload and sought the details about Thompson's job assignments;

(3) on February 23, 2009, Vibbert represented herself as a manager in Vincennes, Indiana and

requested a job be assigned to her that she could do within 30 minutes; (4) on February 24, 2009,

represented herself as a Vincennes manager and requested a specific job be assigned to her; and

(5) on February 26, 2009, Vibbert represented herself as an Indianapolis manager and requested

her entire workload be switched with another technician but then called later to return the

workloads to the original schedule while also inquiring about Thompson's activities.  (*Id*. ¶¶ 10-

14).

On March 12, 2000, Bernie Ubben ("Ubben"), Asset Protection Investigator for Indiana

Bell, interviewed Vibbert, with Lankford and Union Vice President, Debbie Sturgeon

("Sturgeon") also present.  (Vibbert Dep. at 129).  Vibbert admitted that it was wrong for her to

represent herself as a manager in order to change job assignments; in addition, she

acknowledged she did not have the authority to reassign her workload to another technician, or

represent herself as any manager.  (Vibbert Dep. at 100, 116, 120).  Although Vibbert admitted

violating the Code  by falsely representing herself as a manager in the calls at issue, Vibbert

8

maintained that she had been forced to take such actions because she "didn't want jobs assigned to [her] that would require [her] to call another technician for assistance" and "did not want any jobs assigned to [her] that would bring [her] into an area where [she] might run into another technician." (Vibbert Dep. Ex. 11). Vibbert also asserted that she had been the victim of harassment by her male co-workers who had made "nasty comments about [her] and [her] ability to do [the] job," called her "dumb-dumb," and pronounced her name similar to how the word vagina is pronounced. (*Id*.). At the completion of the interview, Ubben prepared a written summary of the interview and Vibbert agreed it was an accurate summary of what she told him. (Vibbert Dep. at 129-30).

On the same day as Vibbert's interview, Ubben also interviewed Lankford, who confirmed that she had listened to the recording of the telephone calls to the NDC and recognized Vibbert's voice. (Lankford Decl. ¶ 15). Ubben prepared a written summary for this interview as well. (*Id*.). On April 2, 2009, Ubben later contacted Dunne in Indiana Bell's Equal Employment Opportunity Department concerning Vibbert's sexual harassment allegations. (Dunne Decl. ¶¶ 5, 6).

### F. Termination of Employment

Babinec received and reviewed Ubben's investigation report on March 12, 2009. (Babinec Decl. ¶ 8). After reviewing the report and consulting with Lankford, Jo Maniscalco, and Grace Biehl ("Biehl"), Babinec concluded that "Vibbert's conduct was inexcusable and intentionally fraudulent", and thus decided to change Vibbert's employment status to "suspended pending termination." (*Id*. ¶ 9). Babinec based his decision on his belief that Vibbert fraudulently represented herself as a manager to monitor the location of Breen and Thompson,

and obtain work assignments closer to where Breen was assigned to work. (*Id*.). Babinec based this conclusion on the fact that Vibbert made multiple calls over multiple days and almost all of them requested the location or work status of Breen or Thompson. (*Id*.). By contrast, Babinec did not think Vibbert changed her work assignments to avoid harassment because her typical assignments did not involve work with other technicians. (*Id*. ¶ 9). Also, Babinec believed that if she were worried about another technician, she had multiple available channels to make a formal complaint about the harassment without having to engage in fraud. (*Id*.).

On April 1, 2009, a Union-Management Review Board meeting was held to discuss Vibbert's employment status. (*Id*. ¶ 10). Attendees included Babinec, Biehl, Vibbert, and union representatives Breen and Sturgeon. (Vibbert Dep. at 161). At the meeting, Vibbert and the union representatives were given an opportunity to state a case for why Vibbert should not be terminated. (*Id*. at 162). Vibbert admitted that for about six months she called the NDC and represented herself as a manager in order to change her workload and the work assignments of other technicians. (*Id*. at 162-63). Vibbert also stated that she never called the EEO group or EEO hotline to report harassment. (*Id*. at 163). After the meeting, Babinec determined that Vibbert did not provide any excuse for her fraudulent conduct and decided to terminate her employment. (Babinec Decl. ¶ 10). As a result, on April 13, 2009, Lead Labor Relations Manager, Biehl, notified union representative Breen that Indiana Bell decided to terminate Vibbert's employment, effective April 9, 2009, and Breen then notified Vibbert. (Babinec Decl. ¶ 12; Vibbert Dep. at 163).

### G. Indiana Bell Internal Investigation

On April 2, 2009, Bernie Ubben contacted Dunne regarding Vibbert's harassment claims. (Dunne Decl. ¶¶ 5-6).  Dunne began her investigation by interviewing Vibbert on April 6, 2009. (*Id.* ¶ 8).  Vibbert told Dunne only the following instances of harassment: Ludwig, a technician, called her "Gina" (pronounced like "vagina"); Boylls, another technician, called her "dumb-dumb"; sexist comments were written in cross boxes; and Titzer, a technician, referred to her and other female technicians as "order bitches."  (*Id.*).

Almost one month later Dunne learned that Vibbert had filed a charge alleging sexual harassment, dated May 5, 2009, with the City of Evansville - Vanderburgh County Human Relations Commission and the EEOC.  (*Id.* ¶ 9).  Dunne reviewed the charge and learned for the first time that Vibbert alleged that her co-worker, Williams, "touched [her] inappropriately and requested sexual favors on numerous occasions."  (*Id.* ¶ 10).  Upon this discovery Dunne spoke with Vibbert again and asked for details about the charge allegations against Williams.  (*Id.* ¶ 10).  Vibbert told Dunne that Williams touched himself, forced her to perform oral sex on him, and touched her all over during the time period of August or September 2008 through the end of her employment.  (*Id.* ¶¶ 12, 13).  Then, on May 15, 2009, at Dunne's request, Ubben interviewed Williams.  (*Id.* ¶ 16).  Williams denied Vibbert's allegations of sexual assault and of having any sexual contact with her, and Ubben found his denial of Vibbert's allegations as credible.  (*Id.*).

During the course of the investigation, Dunne interviewed four male technicians at the Evansville garage who were accused of making derogatory remarks at Vibbert; however, each denied Vibbert's allegations.  (*Id.* ¶ 13).  Dunne also interviewed six female employees who had

been at the Evansville garage during the time period that Vibbert was allegedly harassed, but none of them reported being sexually harassed or treated differently based on gender.  (*Id*. ¶¶ 14).  Dunne spoke to Lankford, Ewers, and Babinec regarding Vibbert's harassment allegations, though none stated they had either observed such behavior or received any reports about it.  (*Id*. ¶ 15).

    After completing her investigation, Dunne concluded that she could not substantiate Vibbert's allegations of being harassed, including those allegations against Williams.  (*Id*. ¶ 17).  As a result, Dunne did not recommend any action be taken concerning Vibbert's employment or the employment of anyone else Vibbert accused of harassment. (*Id*.).  These findings were summed up internally in a report for the investigation file and externally in a position statement prepared in response to the EEOC charge.  (*Id*. ¶¶ 18-19; Exs. 4, 5).

## II.    Motion for Summary Judgment Standard

    Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  A "material fact" is one that "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A genuine dispute as to a material fact exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  *Id.* at 249.  Facts must be supported by citations to the record, which includes "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motion only), admissions, interrogatory answers, or other materials."  FED. R. CIV. P. 56(c)(1).  Parties may assert that "the materials cited do not establish the absence or presence of a genuine dispute[,]"

12

and parties may also object to the admissibility into evidence of the material cited.  *Id.* at

56(c)(1), (2).  The court construes the evidence, and draws all reasonable inferences from the

evidence, in the light most favorable to the nonmoving party.  *Zerante v. DeLuca*, 555 F.3d 582,

584 (7th Cir. 2009).

## III.    Discussion

Vibbert alleges she was terminated from Indiana Bell based on her gender as well as in

retaliation for reporting sexual harassment.  Furthermore, Vibbert claims that her co-workers

created a sexually hostile work environment.  Indiana Bell contends (A) that Vibbert's gender

discrimination and retaliation claims must fail due to her self-admitted fraudulent behavior, and

(B) that Vibbert's sexual harassment/hostile work environment claim does not rise to the level of

legally actionable harassment.

### A.    Gender Discrimination and Retaliation

Vibbert proceeds solely under the direct method of proof on her gender

discrimination and retaliation claims, asserting that various circumstantial evidence indicates

intentional discrimination based on her gender and retaliation for prior reports of sexual

harassment.  Indiana Bell first claims that Vibbert waived her retaliation claim by failing to

include a charge of retaliation in her EEOC complaint.  Second, Indiana Bell claims that

Vibbert's circumstantial evidence does not establish gender discrimination or retaliation, because

there is no evidence that the decisionmaker harbored any discriminatory or retaliatory animus

toward Vibbert.  The court need not address the issue of waiver, however, because the court

agrees that Vibbert has not proven gender discrimination or retaliation under the direct method.

### 1. Retaliation Claim

To establish a retaliation claim under the direct method of proof, Vibbert must present evidence of (1) her engagement in a statutorily protected activity; (2) a materially adverse employment action; and (3) a causal connection between the two. *Turner v. The Saloon, Ltd.*, 595 F.3d 679, 687 (7th Cir. 2010).  A plaintiff may use circumstantial evidence to prove retaliation under the direct method, allowing the jury to infer intentional discrimination by the decisionmaker. *Kampmier v. Emeritus, Corp.*, 472 F.3d 930, 939 (7th Cir. 2007). "Circumstantial evidence may include suspicious timing; ambiguous statements; behavior or comments directed at others in the protected class; and evidence that similarly situated employees outside the protected class received systematically better treatment." *Burnell v. Gates Rubber, Co.*, 647 F.3d 704, 708 (7th Cir. 2011).  To prevail on her Title VII claim, Vibbert must also provide circumstantial evidence that "the *decisionmaker* acted for the prohibited reason.  A decisionmaker is the person responsible for the contested decision." *Schandelmeier-Bartels v. Chicago Park Dist.*, 634 F.3d 372, 378-79 (7th Cir. 2011) (emphasis added).

Vibbert maintains that the sexist comments and behavior of her co-workers, better treatment of male employees than female employees, and positive reviews of Vibbert's past performance are circumstantial evidence of retaliation.  The court disagrees.  While Vibbert's evidence could be evidence of discrimination among her peers, Vibbert presents no evidence suggesting that Babinec, who was the decisionmaker behind Vibbert's termination, harbored any retaliatory animus toward her.  Therefore, in order to satisfy the third element of the direct method, Vibbert must demonstrate a causal connection between her co-workers' illegal bias and Babinec's decision to terminate her employment. *See id.* at 379 (because a plaintiff presented no

evidence of racial animus of decisionmaker, she had to demonstrate a causal connection between her co-workers' bias and the decisionmaker's decision to terminate her).

The link between an employment decision made by an unbiased individual and the impermissible bias of a non-decisionmaking co-worker is known as the "cat's paw" theory. *Id.* Essentially, "the 'cat's paw' refers to the unwitting manager or supervisor who is persuaded to act based on another's illegal bias." *Id.* When a plaintiff is able to show that the biased employee had some degree of influence over the ultimate decision, then juries are permitted to draw an inference that the other employee's impermissible bias infected the decisionmaker's decision. *Id.*

Vibbert presents no evidence whatsoever of any link between Vibbert's co-workers who exhibited discriminatory behavior and Babinec. Even if Lankford and Ewers witnessed the discriminatory behavior or knew of it, Vibbert presents no evidence that they either shared that discriminatory animus or influenced Babinec's decision to terminate Vibbert. Taking the facts in the light most favorable to Vibbert, Babinec's decision to terminate Vibbert was based on nothing other than Vibbert's admittedly fraudulent impersonation of her managers. Vibbert fails to establish any causal connection between her termination and any potential retaliation by Babinec; therefore, her retaliation claim must fail.

### 2. Gender Discrimination

To establish a gender discrimination claim under the direct method of proof, Vibbert must show, either through direct or circumstantial evidence, that the employer's decision to take the adverse job action against her was motivated by an impermissible purpose, such as sex. *Rhodes v. Illinois Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 1994). Vibbert does not present

direct evidence of intentional discrimination.  To survive Indiana Bell's motion, she must,

therefore, present a "convincing mosaic" of circumstantial evidence from which a reasonable

juror could infer intentional discrimination by the decision-maker.  *Id.* (quoting *Troupe v. May*

*Dep't Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994)).

Here, Vibbert presents the same evidence for her gender discrimination claim as her

retaliation claim and her claim fails for the same reason – the decisionmaker did not have actual

knowledge of any of the alleged harassment based on gender.  Therefore, as a practical matter,

Babinec could not have decided to terminate Vibbert based on her gender.  See *Burnell v. Gates*

*Rubber Co.*, 647 F.3d 704, 708 (7th Cir. 2011) (stating "[w]hatever circumstantial evidence a

plaintiff presents must point directly to a discriminatory reason for the employer's action").

Even if all allegations of Vibbert's co-workers are taken as true, Vibbert cannot point to any

evidence to show Babinec's decision to terminate Vibbert was motivated by an impermissible

purpose, such as sex.  Instead, Vibbert's termination resulted from an investigation into her prior

fraudulent conduct.  Accordingly, Vibbert's discrimination claim must also fail.

### B.    Sexual Harassment/Hostile Work Environment

Vibbert next claims that she presented sufficient evidence to allow a jury to determine

that she was subjected to a sexually hostile work environment in violation of Title VII.  Sexual

harassment violates Title VII's prohibition against sex discrimination when the harassment is

"either severe or pervasive enough to create an abusive [or hostile] work environment."  *Jackson*

*v. Cnty. of Racine*, 474 F.3d 493, 499 (7th Cir. 2007) (internal citation omitted).  To establish a

sexually hostile work environment claim under Title VII, Vibbert must prove the following

elements: (1) that her work environment was both objectively and subjectively offensive; (2) that

the harassment was based on membership in a protected class; (3) that the conduct was severe or pervasive; and (4) that there is a basis for employer liability.  *Chaney v. Plainfield Healthcare Ctr.*, 612 F.3d 908, 912 (7th Cir. 2010).  Indiana Bell disputes whether Vibbert's work environment was both subjectively and objectively offensive, whether the conduct was severe or pervasive, and whether there is a basis for employer liability.

Before reaching these arguments, the court must first decide which evidence is relevant and admissible.

### 1. Evidence Reported After Termination

Taking Vibbert's allegations regarding all of Williams' conduct as true, there is no question that her work environment was severely physically threatening and humiliating and an environment that a reasonable person would find hostile or abusive.  However, Vibbert's delay in reporting the most egregious allegations of sexual assault is unreasonable as she waited until the filing of the EEOC letter, dated May 5, 2009, almost one month following her termination.  (Vibbert Dep. at 134-135; 190-91); (s*ee* Dunne Decl. ¶¶ 9-10).  This delay is fatal to considering these allegations because "an employer's notice or knowledge of the harassment is a prerequisite for liability."  *Bernier v. Morningstar, Inc.,* 495 F.3d. 369, 373-74 (7th Cir. 2007) (internal citation omitted).  Therefore, the court will not consider the ten instances of sexual assault involving Williams.

Further, Indiana Bell cannot be held liable for Williams' sexual misconduct because it had a mechanism in place to report harassment but Vibbert failed to utilize it.  *See Durkin v. City of Chicago*, 341 F.3d 606, 612-13 (7th Cir. 2003) (stating "an employer is not liable for co-employee sexual harassment when a mechanism to report harassment exists but the victim fails

to utilize it").  Vibbert knew the Policies were in place to report alleged harassment yet chose to

not report Williams' alleged conduct until after she had been terminated.  Although Vibbert

claimed she feared retaliation and an unhelpful reaction if she did complain, this is not a

sufficient excuse for not utilizing the channels and procedures that Indiana Bell provided.  *See*

*Shaw v. Autozone, Inc.*, 180 F.3d 806, 813 (7th Cir. 1999) (finding that "an employee's

subjective fears of confrontation, unpleasantness or retaliation do not alleviate the employee's

duty . . . to alert the employer to the allegedly hostile environment").  As a result, Vibbert acted

unreasonably in her delay of reporting the accusations until almost nine months after the initial

alleged incident.  *See Roby v. CWI, Inc.*, 579 F.3d 779, 786 (7th Cir. 2009) (finding plaintiff

acted unreasonably when she failed to report harassing conduct for at least five months).

The allegations by Vibbert involve heinous events and activities as documented in the

EEOC charge and subsequent interviews; however, because Indiana Bell did not have notice of

these activities until after termination, such activities cannot be considered in determining

whether a hostile environment existed.

### 2. Evidence From Other Employees

Plaintiff presented evidence from Puro-Bennett that if Williams helped someone on a job,

then that person owed him a sexual favor, which would be a "blowjob."  (Puro-Bennett Dep. at

23).  In addition, Puro-Bennett alleged that Williams forced her to perform oral sex on him and

another time masturbated on her stomach after dragging her into his bedroom.  (*Id*. at 23-25).

Williams allegedly told another employee, Tibbett, that in order for him to help her she must

show him her breasts and private areas.  (Tibbett Decl. ¶¶ 2-3).

This type of evidence is only relevant if Vibbert "'was present for such acts, if they were

18

directed at [Vibbert], or if [Vibbert] knew of such acts at or near the times they occurred.'"

*Stevens v. Life Care Centers of America, Inc.*, No. 4:06-cv-79, 2008 WL 4443089, at *12 (S.D.

Ind. September 25, 2008) (quoting *Fulmore v. Home Depot, U.S.A., Inc.,* No. 1:03-cv-0797,

2006 WL 839464, at *15 (S.D. Ind. 2006)) (internal citations omitted).   None of those situations

are present here.   Vibbert does not introduce evidence that she witnessed any of the alleged

conduct involving the other employees; she does not introduce evidence that such alleged

conduct was directed at her; and she does not introduce any evidence of when or how Vibbert

learned of this other alleged harassment.   As a result, these allegations "do not bear relevance" to

Vibbert's claim.   *Id.*; *see also Fulmore*, 2006 WL 839464, at *15.

### 3. Vibbert's Remaining Allegations of Sexual Harassment

Now the court examines the remaining allegations in the light most favorable to Vibbert

to determine whether Vibbert produces sufficient evidence to survive summary judgment on her

claim for hostile work environment.   But Indiana Bell's conduct cannot, as a matter of law,

constitute a hostile work environment because it is neither sufficiently severe nor pervasive to be

considered objectively hostile.[2]

To determine whether the work environment was objectively offensive, "the environment

must be one that a reasonable person would find hostile or abusive."   *Smith v. NE. Ill. Univ.*, 388

---

[2] Additionally, the court notes that it is questionable whether there is a basis for employer liability
because Indiana Bell may have taken reasonable steps to discover and correct potentially harassing
conduct upon gaining notice of Vibbert's allegations.   After Vibbert's harassment allegations were first
made to Ubben in his investigation, Indiana Bell's Senior EEO Consultant was contacted and a full
investigation was conducted.   (Dunne Decl. ¶¶ 5, 6, 7); *see Montgomery v. Am. Airlines, Inc.,* 626 F.3d
382, 392 (7th Cir. 2010) (stating "[a]n employer can generally avoid liability for a hostile work
environment if it promptly investigated complaints made by the plaintiff and acted to stop the harassing
behavior").   However, a definitive determination of this issue is unnecessary, as Vibbert is clearly unable
to demonstrate the applicable conduct was sufficiently severe or pervasive to be considered objectively
hostile.

F.3d 559, 566 (7th Cir. 2004) (quotations omitted).  Factors to consider are the "frequency of the

discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a

mere offensive utterance; and whether it unreasonably interferes with an employee's work

performance."  *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998) (internal

quotations omitted).  Properly applied, these factors filter out complaints attacking "the ordinary

tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes,

and occasional teasing."  *Id.*  To that end, "[c]onduct that is unpleasant, but is not severe or

pervasive, will not constitute a hostile work environment prohibited by Title VII."  *Stevens*, 2008

WL 4443089, at *11.  By contrast, "[t]he workplace that is actionable is the workplace that is

hellish."  *Wyninger v. New Venture Gear*, 361 F.3d 965, 977 (7th Cir. 2004) (citation omitted).

Here, actions by Vibbert's co-employees taken as a whole and in light most favorable to Vibbert

do not rise to this hellish standard.

First, Vibbert must show that any alleged conduct was directed at her because of her sex.

*Roby,* 579 F.3d at 784.  As a result, Vibbert's allegations of being called "dumb-dumb" and an

"order bitch" cannot be found to constitute sexual harassment.  Vibbert admitted that Boylls

referred to her as "dumb-dumb" because of her work performance, not her gender.  (Vibbert

Dep. at 144-45).  Similarly, Vibbert's allegation that Titzer called her an "order bitch" is equally

irrelevant as this phrase referred to the type of work being done by technicians, not their gender.

(Vibbert Dep. at 164-65).  Thus, neither of these will be considered in determining whether a

hostile work environment exists.

On the other hand, allegations that will be considered include the following: (1) male

employees pronouncing Vibbert's name like "vagina"; (2) derogatory comments about women

on cross boxes; and (3) Williams' comment that he "came for . . . a blowjob" when sent to assist Vibbert in the summer of 2008.  The sum of this conduct does not rise to the level of legally actionable sexual harassment.  *See Wyninger,* 361 F.3d at 977 (stating "[n]ot every unpleasant workplace is a hostile environment. The occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers would be neither pervasive nor offensive enough to be actionable").

In particular, co-workers' name calling of Vibbert is the type of behavior that must be filtered out as "immature and ignorant behavior" involving "abusive language" and "gender-related jokes."  *Yancick,* 653 F.3d at 545; *Faragher*, 524 U.S. at 787-88.  Similarly, the sexist comments in the cross box also fall into this category.  *See Hine v. Extremity Imagining Partners, Inc*., 773 F.Supp.2d 788, 796 (S.D. Ind. 2011).  Further, Vibbert admitted that these comments were not directed at her and were sprayed over within a year.  (Vibbert Dep. at 150-51); *see Yancick v. Hanna Steel Corp.,* 653 F.3d 532, 545 (7th Cir. 2011) (finding "the more remote or indirect the act claimed to create a hostile working environment, the more attenuated the inference that it had an effect on the terms and conditions of the plaintiff's workplace").  Again, "offhand comments, isolated incidents, and simple teasing do not rise to the level of conduct that alters the terms and conditions of employment."  *Hine v. Extremity Imaging Partners, Inc.*, 773 F. Supp. 2d 788, 797 (S.D. Ind. 2011).

By contrast, Vibbert's final allegation concerning Williams' request for a "blowjob" is much more serious than the others.  However, it still does not create an actionable claim as it is only an "isolated incident" since Vibbert did not report to management or her union representative any subsequent harassment by Williams.  (Vibbert Dep. at 134-135; 190-91; s*ee* Dunne Decl. ¶¶ 9-10); *Faragher*, 524 U.S. at 788 (noting theme in Title VII cases that "isolated

incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment").  In the end, these allegations do not add up to creating conduct which interfered with Vibbert's terms and conditions of employment.

In fact, there is no evidence that it interfered with her work.  Although Vibbert alleges that her fraudulent phone activity stemmed from a hostile work environment, at no point did she seek information of her alleged harassers but instead seemed focused on the location of Breen and Thompson, not Williams.  Moreover, the harassment at issue allegedly occurred well before the time period when Vibbert made calls to NDC, so the fraudulent calls would have occurred long after the first allegations of sexual harassment.  At its core, "Title VII does not guarantee that an employee will experience a certain comfort level at work, only that she not experience an abusive, hostile work environment."  *Hine,* 773 F. Supp. 2d at 797.  Such an "abusive, hostile work environment" does not exist here, so Vibbert's sexual harassment claim must fail.

## IV. Conclusion

For the reasons set forth above, the court **GRANTS** Defendant's Motion for Summary Judgment for gender discrimination (Count I), sexual harassment/hostile work environment (Count II), and retaliation (Count III).

**SO ORDERED** this 29th day of September 2012.

_____

RICHARD L. YOUNG,  CHIEF JUDGE
United States District Court
Southern District of Indiana

Distributed Electronically to Registered Counsel of Record